CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
9/22/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 4:24-cr-00009-001 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| RICHARD ELIJAH JACOBS, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

The defendant, Richard Jacobs, was indicted on a slew of drug and gun charges following a traffic stop, and his arrest, by local police officers. Specifically, the grand jury charged Jacobs with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a) (Count One), possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a) (Count Two), unlawful possession of one or more machineguns, in violation of 18 U.S.C. § 922(o) (Count Three), possession of one or more machineguns in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(B)(ii) (Count Four), and possession of one or more firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Five). (*See* ECF No. 1.) The defendant pleaded not guilty, and this matter proceeded to trial.

At that trial, Jacobs moved, at the close of the government's evidence, for a judgment of acquittal under Rule 29(a) on both machinegun counts. In support of that motion, the defendant argued that the government had failed to prove that *he knew* that either of two machineguns recovered from his car during the traffic stop—a modified Glock 21 pistol with an attached 40-round drum magazine and a RF-15 assault pistol—had the characteristics of

machineguns (*i.e.*, that they were capable of firing more than one round with a single pull of the trigger).

The court reserved decision on Jacobs's Rule 29 motion and submitted the case to the jury. Following a short deliberation, the jury found the defendant guilty on all counts, including both machinegun charges. Jacobs timely renewed his motion for judgment of acquittal.

After carefully reviewing the evidence presented at trial and the relevant case law cited in the post-trial briefs, the court concludes that the government presented sufficient evidence to prove that Jacobs had the requisite knowledge of machinegun characteristics.[1] Accordingly, his motion for judgment of acquittal will be denied.

**I.**

During Jacobs's opening statement to the jury—and again in closing argument—his attorney conceded that the evidence was sufficient to convict him on the drug charges, as well as unlawfully possessing "firearms" as a convicted felon—Counts One, Two, and Five. The defendant thus based his entire trial defense on attacking the government's theory that he knew that the modified Glock 21 pistol and RF-15 assault pistol had the specific characteristics of machineguns. In other words, the defendant effectively conceded that he had possessed the Glock 21 and RF-15 (as a convicted felon), but he maintained that the government's evidence was lacking as to his knowledge that either of these weapons had the characteristics of machineguns, which was required to convict him on Counts Three and Four.[2]

---

[1] The court dispenses with additional oral argument on the motion because the relevant facts and legal standard are adequately presented in the trial transcript and the parties' post-trial briefs.

[2] This concession that he possessed both firearms at issue is ultimately damning for purposes of the Rule 29 motion because, as discussed below, it undermines his efforts to distinguish persuasive authority about the nature and quantity of circumstantial evidence necessary to convict a defendant of a machinegun charge.

This strategy was only partially effective, as the jury ultimately determined that the government had met its burden of proving the defendant's knowledge regarding the Glock 21, but not the RF-15. It convicted Jacobs on both Counts Three and Four based on the specific finding that he knew of the Glock 21's machinegun characteristics.[3] Accordingly for purposes of analyzing the renewed Rule 29 motion, the court summarizes the trial evidence as it relates to the modified Glock 21 pistol—and the defendant's purported knowledge of its machinegun characteristics—in the light most favorable to the government.[4]

Jacobs's February 3, 2024 encounter with the South Boston Police stemmed from a 911 call. According to Corporal Scott Kenney, who was the first of three police officers to come into contact with the defendant that day, the dispatcher informed him that the 911 caller had reported seeing a white Jaguar occupied by two black males who were displaying firearms from inside the vehicle.[5] Within minutes of receiving this information, Corporal Kenney located a white Jaguar driving on Wilborn Avenue. Corporal Kenney tailed the Jaguar from there, until it turned into a shopping center parking lot.

---

[3] The jury specified as much on its verdict form. (*See* ECF No. 100.)

[4] Transcripts from the trial are available at ECF Nos. 106 & 107; the facts recited herein are taken from those transcripts unless otherwise noted, and direct quotes are cited for specific reference.

[5] In briefing his renewed Rule 29 motion, Jacobs's counsel takes issue with the "hearsay nature" of Corporal Kenney's testimony about the 911 call. But the defendant never objected to the government's questions of Corporal Kenney about the 911 call. Moreover, Jacobs's counsel elicited additional testimony from Corporal Kenney and another responding officer about the substance of the 911 call on cross examination. In so doing, counsel was trying to highlight the inconsistency between Corporal Kenney's recollection at trial that he had been told by the 911 dispatcher that the caller had witnessed both occupants of the vehicle flashing guns, and his subsequent written report in which he had noted that "[a] rifle was displayed in the vehicle." (May 19 Tr. 46:16–17.) Despite this inconsistency and vigorous cross-examination, Corporal Kenney remained adamant that he was told by the dispatcher that the 911 caller described both occupants having brandished firearms. In failing to object initially and later widening the door on cross-examination, Jacobs has waived any valid objection he may have had to the admissibility of this testimony.

As Corporal Kenney approached the Jaguar, he observed the defendant, who had been driving, exit the car on the driver's side.[6] By the time Kenney got out of his cruiser, the front-seat passenger, who was later identified as James Hiett, had already exited the Jaguar and was walking towards the entrance of a nearby grocery store.[7] In response to Corporal Kenney, Jacobs told the officer the Jaguar was his, but he could not produce a driver's license. He also claimed he did not know the name of his passenger who had just fled on foot.

Within a couple minutes, two additional officers arrived on scene to assist. Sergeant Trevor Richardson walked around the outside of the defendant's vehicle and peered through the car's windows along with Officer Brandon Coates. While looking through one of the rear windows into the backseat area, Sergeant Richardson observed the stock of what appeared to be an assault rifle protruding from underneath a sweatshirt on the floorboard, behind the driver's seat. Sergeant Richardson then asked the defendant if he was a felon, and Jacobs acknowledged that he was. At that point, the officers placed Jacobs under arrest.

Following Jacobs's arrest, the officers searched the interior of his Jaguar. They first recovered the RF-15 assault pistol from the floorboard of the backseat on the driver's side, which had been partially obscured by the sweatshirt.[8] Next, they discovered a Glock 21 pistol lying on the floorboard in front of the driver's seat, underneath the floormat. Sergeant

---

[6] The entire encounter, including the defendant's arrest and the officers' recovery of the firearms, was captured on the officers' body-worn cameras and played for the jury.

[7] The responding officers later attempted to locate Mr. Hiett inside the grocery store but were unsuccessful. He was arrested about a week later and charged with unlawfully possessing a Glock 19 pistol—the third firearm recovered from the Jaguar on February 3, 2024—and pleaded guilty to that offense. Hiett did not testify at Jacobs's trial.

[8] An RF-15 looks like a rifle in that it features a long barrel, but it is considered a pistol because it possesses a thin buffer tube, rather than a traditional butt stock, and has a pistol-like grip near the trigger guard.

Richardson and Officer Coates both testified that this weapon's presence was immediately obvious given the large bulge in the floormat caused by the capacious 40-round drum magazine, which was attached to the gun. The officers also recovered a third weapon, a Glock 19, from underneath the front passenger seat where Mr. Hiett had been sitting before he set off for the grocery store.[9]

Officer Coates, who retrieved the black Glock 21 pistol from underneath the driver's side floormat, testified that as soon as he reached down to pick up the pistol, he noticed a silver "selector switch," which "was affixed to the back of the slide." (May 19, 2025 Tr. 88:3–12 [ECF No. 106] (hereinafter "May 19 Tr.").) Sergeant Richardson also immediately noticed the chrome-colored plate that was attached to the rear of the slide. And Corporal Kenney testified that the chrome piece attached to the back of the pistol's firearm slide "immediately stuck out as not belonging there." (*Id.* 35:8–10.) Corporal Kenney further explained that, normally, the end of a Glock pistol's slide mechanism is flush—"it's just a flat plate"—and that "[t]here's nothing sticking out." (*Id.* 35:20–21.)

The officers also testified that after they recovered this Glock pistol, they determined that there was a live round in the chamber and additional ammunition in the drum magazine. After the Glock 21 was admitted into evidence, the court permitted each member of the jury to physically inspect it. Corporal Kenney also testified about later finding a small weapon light in the driver's side door pocket. Although this weapon's light was missing a clamp and one screw, it was capable of being attached to the Glock 21.

---

[9] Hiett accepted responsibility for possessing this third firearm as part of his guilty plea to possessing a firearm by a convicted felon, and the government did not otherwise attempt to connect this third gun to the defendant at his trial.

- 5 -

Near the end of its case, the government called Steve Kokkinakos, a firearms analyst with the Virginia Department of Forensic Science, who was designated—without objection—as an expert in that field. Mr. Kokkinakos explained his process of examining both firearms at issue and his conclusion, based on his visual inspections and confirmatory test firing, that both the RF-15 and the Glock 21 pistol were capable of firing more than one round with a single pull of the trigger, and thus, that each firearm met the statutory definition of a machinegun.

Regarding the Glock 21, Kokkinakos testified that, like the arresting officers, he immediately noticed the presence of the metal piece on the rear slide, which he identified as a "Glock switch" or "modified slide plate cover," and which, based on his training and experience and general knowledge of the firearms, he suspected would allow the Glock to fire automatically. (May 20, 2025 Tr. 16:2–7 [ECF No. 107] (hereinafter "May 20 Tr.").)



(May 20 Tr. Gov'm Ex. 9b.) To confirm that hypothesis, Kokkinakos conducted a "function test," manipulating the slide mechanism and pulling the trigger (while the firearm was unloaded) and listening for a corresponding trigger reset with each pull. When he did not hear the trigger resetting, this corroborated his initial conclusion that the Glock switch had modified the firearm to fire automatically. Finally, Kokkinakos loaded two rounds into the Glock's magazine and test fired the gun. When he pulled the trigger once, it expelled both rounds, confirming his initial conclusion that the Glock switch had modified this weapon to fire automatically.

Kokkinakos went into similar detail about examining and test firing the RF-15 assault pistol. He also explained the key difference in how this weapon had been modified to fire automatically. Unlike the Glock selector switch, which was attached to the outside of the gun and was readily apparent to the naked eye, the RF-15's automatic modification was caused by the insertion of a piece of blue plastic, known as an "auto sear," which is only visible when that firearm is disassembled.

On cross-examination, Jacobs's counsel zeroed-in on this difference, having Kokkinakos confirm that the RF-15 did not have any "visual indicators," like the Glock 21, that it could fire automatically. (*Id.* 28:6-8.) As to the Glock, defense counsel pushed Kokkinakos to concede that the presence of the switch on the outside of this gun only triggered suspicion that it modified the weapon to fire automatically, and that he had to conduct confirmatory testing, including test firing the weapon, to prove that theory. But Kokkinakos stood his ground, testifying that he had test fired the Glock "to confirm [his] initial decision." (*Id.* 32:9–12.) Jacobs's counsel, upon further questioning, had Kokkinakos

concede that not all modified switch plates permit automatic fire. On that point, Kokkinakos allowed that "[t]hey can be aesthetic or they can be functional in the form of a belt clip." (*Id.* 35:19–20.) But Kokkinakos added that the "only time [he'd] seen a device like this [on a Glock] is when it's intended to convert the firearm from semiautomatic only to select fire or fully automatic fire." (*Id.* 37:3–6.)

## II.

"A defendant may move for judgment of acquittal, or renew such motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). A judgment of acquittal is appropriate where "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

But a defendant who challenges the sufficiency of the evidence carries "a heavy burden." *United States v. Gallagher*, 90 F.4th 182, 190 (4th Cir. 2024) (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)). The court must determine "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996). Ultimately, the court must deny the motion—and sustain the verdict—if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

### III.

Jacobs's renewed Rule 29 motion only pertains to Count Three, unlawful possession a machinegun, in violation of 18 U.S.C. § 922(o), and Count Four, possession of a machinegun in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(B)(ii). Moreover, Jacobs only challenges the sufficiency of the government's proof as to a single, shared element of both offenses—namely, whether he had "knowledge of the characteristics that brought [his] gun within the statutory definition."[10] *United States v. Tanco-Baez*, 942 F.3d 7, 26 (1st Cir. 2019) (quoting *United States v. Olofson*, 563 F.3d 652, 659 (7th Cir. 2009)). Jacobs's sole argument is that the government failed to prove that *he knew* the modified Glock 21 pistol with the drum magazine, which he otherwise admitted to possessing, was a machinegun.[11]

Under federal law, a machinegun is defined as any weapon which "shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Thus, to satisfy the knowledge requirement, the government must prove that "the defendant had knowledge of the characteristics that brought the gun within [this] statutory definition, and not that []he had knowledge that the gun was in fact considered a machinegun under federal law." *United States v. Nieves-Castano*, 480 F.3d 597, 599 (1st Cir. 2007). And the Supreme Court has recognized that this knowledge, in turn, "can be inferred from circumstantial evidence, including any

---

[10] Given some of the arguments Jacobs makes in his post-trial briefing, it bears repeating that he conceded at trial that he possessed the firearms at issue and that he did so unlawfully as a previously convicted felon. Moreover, as to Count Four, the defendant does not challenge the sufficiency of the government's evidence that the gun possession was also in furtherance of drug trafficking.

[11] As noted above, the jury convicted Jacobs of the machinegun counts solely based on the Glock pistol, rather than the RF-15.

external indications signaling the nature of the weapon." *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994).

Indeed, the parties agree that no direct evidence presented at trial establishes that Jacobs knew this firearm had the characteristics of a machinegun. There was no evidence presented that he ever admitted that the Glock 21 was capable of firing automatically or that anyone ever told him as much. And there was no evidence that he had previously fired the pistol, obtaining that knowledge through prior experience. Thus, this case falls into the heartland of machinegun-possession cases where the government relies solely on circumstantial evidence to prove that knowledge.

Given the paucity of case law in the Fourth Circuit on this issue, both parties rely on abundant precedent from the First Circuit analyzing the nature and quantity of circumstantial evidence necessary to establish a defendant's knowledge of a firearm's machinegun characteristics. The government argues that the facts of this case are on all fours with this persuasive Circuit precedent, which, with one exception, affirmed the defendants' machinegun convictions. Jacobs attempts to distinguish the cases where the First Circuit affirmed the convictions and argues that the facts of his case are more like the one case where the First Circuit found the circumstantial evidence wanting. As explained below, Jacobs's attempt to do so is unavailing.

In *United States v. Torres-Perez*, the First Circuit affirmed a conviction for unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o), finding that the evidence presented by the government was sufficient to sustain the defendant's conviction. 22 F.4th 28 (2021). At his trial, police officers described seeing the defendant, who was standing on the

driver's side of a parked truck, reach into the waistband of his shorts, retrieve a firearm with an extended magazine, and throw it into the cab. *Id.* at 30. Torres-Perez then fled the scene. *Id.* When one of the officers retrieved the firearm, a 9-millimeter Glock pistol, from the truck, he immediately noticed that the back plate of the slide mechanism had a small piece attached to it that was not standard for that firearm. *Id.* The officer also testified that the Glock was equipped with an extended magazine that contained 22 rounds of ammunition. *Id.* The jury also heard testimony from a firearms expert, who explained that the purpose of the small piece attached to the end of the slide had "made it obvious" to him that the firearm was capable of firing automatically. *Id.* at 31. The expert confirmed as much by pulling the trigger (with the gun unloaded) and observing the slide and, later, by test-firing the weapon. The court also noted that the jury was allowed to view the Glock for themselves. *Id.*

Based on this evidence, the First Circuit rejected the defendant's argument that there was insufficient evidence that he knew the Glock had the characteristics of a machinegun. The court first noted that the government had presented testimony from two witnesses that the "alterations to the Glock were obvious and visible" and, thus, that the jury could have inferred that the defendant was aware of these modifications given his possession of the gun. *Id* at 33. The court added that the jury had viewed the Glock—and its modifications—for themselves, and therefore "had the opportunity to decide whether the chip was visible and obvious to [the defendant]." *Id.* Finally, the court noted that the firearm itself had been outfitted with an extended magazine, "so the jury could have inferred that [the defendant] knew that the Glock could fire multiple bullets with one pull of the trigger." *Id.* "Taking the evidence of the Glock's appearance and capability to fire more than one bullet at a time in the light most favorable to

the verdict, a jury could reasonably find beyond a reasonable doubt that Mr. Torres knew that the Glock he removed from the waistband of his shorts and threw into the open driver's side window had the characteristics of a machinegun." *Id.*

The First Circuit recently applied *Torres-Perez* to affirm machinegun convictions predicated on similar circumstantial evidence. In *United States v. Perez-Greaux*, the court concluded that the open and visible nature of a small plate attached the rear of the slide mechanism of a Glock pistol, which the jury viewed for itself, as well as the presence of a high-capacity magazine were sufficient to infer the defendant's knowledge of the weapon's machinegun characteristics. 83 F.4th 1, 26–27 (1st Cir. 2023). Similarly, in *United States v. Matta-Quiñones*, the court upheld a machinegun conviction where the jury had the opportunity to see the "externally visible" modifications to the rear of the slide mechanism for themselves and heard that the pistol at issue was stored near high-capacity magazines. 140 F.4th 1, 10–11 (1st Cir. 2025).

In *United States v. Nieves-Castano*, the case on which Jacobs relies, the First Circuit held that the circumstantial evidence relied on by the government was insufficient "to establish, beyond a reasonable doubt, the defendant's knowledge that the rifle possessed the characteristics of an automatic weapon." 480 F.3d 597, 602 (1st Cir. 2007). Unlike the firearms at issue in *Torres-Perez*, *Perez-Greaux*, and *Matta-Quiñones*—pistols featuring obvious attachments to the rear slide mechanisms—the machinegun possessed by the defendant in *Nieves-Castano* was an AK-47 that had been modified to fire automatically "through the alteration of internal parts." *Id.* at 600. The court noted that the only external indication of this internal modification was a "small mark or hole" on the gun's surface. *Id.* Although the court

recognized that circumstantial evidence supporting a defendant's knowledge of machinegun characteristics typically includes "'external indications signaling the nature of the weapon[,]'" it concluded that this "small mark on the weapon between the fire and safety settings" was too slight and insubstantial to tip-off "a lay person about the weapon's [machinegun] capabilities . . . ." *Id.* at 601 (quoting *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994)). The court further doubted, given that this rifle had been stored inside a golf bag, that the defendant, who had admitted to storing the weapon for a friend but whom the government had failed to show had otherwise ever handled or inspected the weapon, would have been able to see this small mark simply by peering into the golf bag. *See id.* The court noted that the golf bag also contained a drum magazine and additional "clip-type" magazines, but pointed out that there was no evidence that the defendant had ever seen these accessories. *Id.*

From *Torres-Perez* and its recent progeny, a general rule emerges: A reviewing court should not disturb a machinegun conviction based on circumstantial evidence if (1) the machinegun modification was external and obvious; (2) the jury had the opportunity to view this modification for itself; and (3) the firearm was equipped with—or was in close proximity to—a high-capacity magazine. But *Nives-Castano* provides the exception to this rule: Where the machinegun modification is made to the internal components of the weapon and is otherwise not obvious upon visible inspection of the exterior of the firearm, that internal modification does ordinarily not permit the inference that the defendant knew of the firearm's true capabilities.

Much as the defendant resists the conclusion, the evidence presented at Jacobs's trial is virtually identical to the evidence that the First Circuit has deemed sufficient to prove

knowledge of machinegun characteristics. As in *Torres-Perez*, the government presented evidence that the defendant handled the Glock 21 prior to his arrest. Corporal Kenney testified, without objection, that he had been informed that both occupants of a white Jaguar had been brandishing firearms. Based on that report, he located the Jaguar in question, which the defendant was driving. After the officers arrested Jacobs, Sergeant Richardson recovered the Glock pistol from the driver's-side floorboard. He recalled that the floormat was "protruding so high" given the presence of the drum magazine that he "could tell that it [sic] was a gun right there." (May 19 Tr. 67:5–7.) Given this evidence, a reasonable jury could infer that Jacobs had handled the Glock, which he then hurriedly attempted to conceal before the officer arrived.[12] Undoubtedly, Jacobs's admission during his opening statement that he had possessed this firearm only strengthened that inference in the jury's mind.

It necessarily follows that the jury could reasonably conclude that the defendant was aware of the external, obvious, and obtrusive nature of the selector switch on the rear of the slide mechanism. The switch itself was a distinct chrome color, whereas the rest of the firearm was black. (*See* Tr. Gov'm Ex. 9b.) All the government's witnesses who examined the firearm testified that they noticed this off-color appendage immediately, and the government's expert added that, based on this observation, he initially concluded that it rendered the Glock capable of firing automatically. (*See* May 20 Tr. 16:2–10.) But the jury didn't have to accept this testimony at face value. Once the gun was admitted into evidence, they had the opportunity to inspect the Glock for themselves. Their hands-on observations of this otherwise obvious

---

[12] It strains credulity to suggest otherwise, given the difficulty of driving a car with such a large obstruction under the driver's feet.

- 14 -

external modification only strengthened the inference that Jacobs himself was also aware of it. *See Matta-Quiñones*, 140 F.4th at 11 ("[T]he jury had the opportunity to view the firearms up close and gauge whether Matta would have noticed the modifications and understood their purpose."); *Perez-Greaux*, 83 F.4th at 27 ("[H]ere, the jury was given the opportunity to view the machinegun and the visible alterations made as described by the government's expert."); *Torres-Perez*, 22 F.4th at 33 ("[T]he jury could view the Glock for themselves during trial and had the opportunity to decide whether the chip was visible and obvious to Mr. Torres.").

The presence of the 40-round drum magazine, which was attached to the Glock, only solidified this conclusion. Since the jury heard testimony that a standard-issue magazine for a Glock 21 pistol holds 13 rounds of ammunition, it could logically conclude that Jacobs knew it would fire automatically. *Torres-Perez*, 22 F.4th at 33 ("The Glock had an extended magazine to accommodate additional ammunition so the jury could have inferred that Mr. Torres knew the Glock could fire multiple bullets with one pull of the trigger."). As the government points out, the attendant inference is even stronger here, given that Mr. Torres's magazine held 30 rounds, while the defendant's held 40. While the drum magazine is certainly not determinative, in and of itself, of the defendant's knowledge of the Glock's true capabilities, its presence, in conjunction with the obvious external modification, permits a reasonable inference that Jacobs knew he possessed a machinegun.

Finally, the government presented some evidence of Jacobs's "familiarity with firearms generally," which the First Circuit has recognized otherwise supports the inference that a defendant was aware of a particular firearm's machinegun characteristics. *See United States v. Shaw*, 670 F.3d 360, 364 (1st Cir. 2012). One of the government's witnesses testified that

investigators had discovered photographs of other firearms on the defendant's phone. (May 19 Tr. 126:14–7.) The arresting officers also testified about recovering a weapon light capable of attaching to the Glock 21 mere inches from where the gun was recovered. Perhaps most significantly, as Jacobs admitted to during his opening statement—and the government later corroborated in its case-in-chief—the defendant had possessed a second firearm, the RF-pistol, which, like the Glock 21, had been modified to fire automatically. In sum, this additional evidence only served to strengthen the inference that Jacobs knew of the pistol's true capabilities.

Jacobs nevertheless attempts to distinguish these cases, first arguing that, in *Torres-Perez*, unlike his case, the arresting officers saw the defendant handle the gun before they recovered it. But even discounting Corporal Kenney's testimony about both occupants of the Jaguar brandishing firearms, as well as the circumstantial evidence of actual possession (*i.e.*, the fact that the pistol with its large drum magazine was poorly hidden in the very spot where Jacobs's feet had been just minutes before), the defendant can't rise above his concession at trial that he otherwise possessed the pistol. Indeed, both *Perez-Greaux* and *Matta-Quiñones* involved constructive, rather than actual, firearm possession. The First Circuit ultimately found this distinction immaterial, concluding that the juries may nevertheless infer the defendant's knowledge of machinegun characteristics from open and obvious nature of the selector switches and the presence of high-capacity magazines.

Jacobs also seizes on the fact that the government's expert, Mr. Kokkinakos, testified that he test-fired the Glock to confirm his initial conclusion that it was capable of firing automatically. While confirmatory test-firing was part of this firearm expert's standard

protocol—and necessary to prove that the gun, in fact, met the statutory definition of a machinegun—the jury was still free to infer that Jacobs knew of this capability because of the obvious external modifications and other evidence, without proof that he had previously fired the gun. *See Perez-Greaux*, 83 F.4th at 27 (noting that the government is not required to "present evidence that a layperson (rather than an expert) could draw the conclusion, simply by looking at the firearm, that it had been modified to a machinegun" where other evidence indicates that the defendant understood the purpose of the modification). Stated differently, the fact that Kokkinakos test-fired the weapon as a final step of his expert protocol does not vitiate otherwise valid inferences drawn by the jury about the defendant's knowledge given the obvious presence of the selector switch, the attached drum magazine, and other evidence that he was generally familiar with firearms.[13]

In sum, despite the defendant's arguments to the contrary, the government presented sufficient evidence of his knowledge of the Glock 21's machinegun characteristics. While Jacobs contends that this evidence was too speculative and otherwise insufficient to prove his knowledge, that argument is foreclosed by Supreme Court and persuasive Circuit precedent. The nature and quantum of evidence presented in this case is nearly identical to the evidence relied on by the government to obtain convictions in other machinegun prosecutions, all of which were affirmed on appeal. This court will not disregard this precedent and hold the

---

[13] The same is true with respect to Kokkinakos's testimony about the existence of aesthetic—so-called "novelty"—and belt-clip switches. Granted, the existence of these devices, which also attach to Glock pistols without converting them into machineguns, may weaken the inference that Jacobs knew that the selector switch on the Glock 21 was functional rather than aesthetic. But a reasonable jury could still conclude that the defendant knew the switch on the Glock 21 affected the functioning of the weapon, given the absence of graphics or logos on the switch itself and Kokkinakos's testimony that he had never personally encountered a Glock switch that did act to convert a semiautomatic pistol into a machinegun.

government to a higher evidentiary standard.[14] Accordingly, the defendant's renewed motion for judgment of acquittal will be denied.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 22nd day of September, 2025.

> */s/ Thomas T. Cullen*
> HON. THOMAS T. CULLEN
> UNITED STATES DISTRICT JUDGE

---

[14] The court would be remiss if it didn't address the defendant's observation that, at trial, it "visibly (and appropriately) struggled with the sheer lack of evidence on this singular element." (Def.'s Br. in Supp. of Mot. for J. of Acquittal p. 14 [ECF No. 111].) Indeed, at the time the defendant made his initial Rule 29 motion, the court indicated that the question of the defendant's knowledge was a close call. But this initial reticence was primarily due to its unfamiliarity with the First Circuit precedent on this issue. Having reviewed those cases in depth with the aid of the parties' post-trial briefs, the court is convinced that the government satisfied its evidentiary burden on this score. Of course, the Fourth Circuit is free to disregard this out-of-circuit precedent and construct a different, and higher, standard of proof for machinegun prosecutions, but this district court is not inclined to do so.